[S. F. No. 6985. In Bank.—February 8, 1915.]

NEAL PUBLISHING COMPANY (a Corporation), Respondent, v. JAMES ROLPH, Jr., as Mayor of the City and County of San Francisco, Appellant.

MUNICIPAL CORPORATIONS—SAN FRANCISCO—CHARTER PROVISION LIMITING HOURS OF LABOR AND FIXING MINIMUM PRICE FOR WORK FOR CITY—CONTRACT FOR FURNISHING SUPPLIES.—The provision of section 1 of chapter III of article II of the charter of the city and county of San Francisco, providing that "Every contract for work to be performed for the city and county must provide that in the performance of the contract eight hours shall be the maximum hours of labor on any calendar day, and that the maximum wages of laborers employed by the contractor in the execution of his contract shall be three dollars a day," and declaring void any contract for work so to be performed which does not comply with such provision, and that any officer who shall sign the same shall be guilty of misfeasance and upon proof thereof shall be removed from office, has no application to a contract awarded to a successful bidder for the furnishing of certain supplies in the way of printed blanks and forms, for use in the several departments of the city government.

ID.—CONTRACT TO FURNISH FINISHED ARTICLE NOT DOING WORK FOR CITY.—Such contract does not provide for the doing of work for the city and county, within the meaning of the charter provision. It is simply one for the furnishing of certain finished articles of merchandise, which the contractor may have printed anywhere he chooses. These articles are the property of the contractor until delivered to

the city, and do not come within the provision, as no work is done for the city.

ID.—RESOLUTION DIRECTING HEADS OF DEPARTMENTS TO PATRONIZE UNION LABEL PRINTING OFFICES—BOARD OF SUPERVISORS NOT CONTROLLED BY IN AWARDING CONTRACTS—REFUSAL OF MAYOR TO EXECUTE CONTRACT.—A resolution of the board of supervisors of the city and county, instructing the heads of departments "to patronize only printing establishments that pay full wages, and, as a guarantee thereof, all city and county printing hereafter shall bear the label or be done in offices entitled to the use of the label of the Allied Printing Trades' Council of the city and county of San Francisco," and further instructing the printing committee to award all jobs for printing to union officers, is simply a direction to the heads of departments and the printing committee, and is in no way binding on the board itself in awarding contracts; and the mayor of the city and county is not justified in refusing to execute a contract for the furnishing of printed materials to the city, which had been awarded to a successful bidder by the board of supervisors, merely because such bidder, at the time the contract was presented to the mayor for execution, was not entitled to use such label.

ID.—RESOLUTION INCONSISTENT WITH CHARTER PROVISIONS GOVERNING AWARD OF CONTRACTS—DIRECTION FOR AWARD TO LOWEST BIDDER.— Resolution No. 2458 (fourth series) of the board of supervisors of the city and county of San Francisco, passed in the year 1899, and embodying such instructions as to city and county printing, is in conflict with the provisions of the subsequently adopted charter of the city and county regulating the method of acquiring stationery and supplies in the way of printed blanks by competitive bidding, and requiring the supervisors, subject to the right to "reject any and all bids" under specified conditions, to award the contract to the lowest bidder offering adequate security, "quantity and quality being considered."

ID.—SUPERVISORS CANNOT IMPOSE CONDITIONS NOT CONTAINED IN CHARTER.—The board of supervisors of the city and county, in letting contracts for such supplies since the adoption of the charter, cannot impose conditions in addition to those provided therein, and any ordinance or resolution purporting to do so is ineffectual.

ID.—CONSTRUCTION OF WORDS "QUANTITY AND QUALITY CONSIDERED."— The words "quantity and quality considered," as used in the charter, do not justify such resolution. They mean simply that in determining what is the lowest bid made, the board may take into consideration the "quantity and quality" of the supplies proposed to be furnished by the respective bidders.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco.   J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

Percy V. Long, City Attorney, J. F. English, Assistant City Attorney, and Geo. B. Benham, for Appellant.

W. B. Kollmyer, and J. C. Campbell, Weaver, Shelton & Levy, *Amici Curiae,* for Respondent.

ANGELLOTTI, C. J.—Hearing granted in the supreme court after decision by the district court of appeal, first district.

This is an appeal from a judgment directing that a writ of mandate issue on the application of the petitioner, commanding the appellant, as mayor of the city and county of San Francisco, to sign and execute a certain contract with the petitioner for the furnishing of certain supplies in the way of printed blanks and forms, for use in the several departments of the city government, which contract had been awarded to the petitioner as the successful bidder for such supplies.

There is no dispute as to the facts which, so far as material to the questions raised, are as follows: The board of supervisors of the city and county of San Francisco, acting in conformity with the charter provision, regularly advertised for bids for the furnishing and delivery of a required quantity of specified printed forms and blanks for the use of the various offices and departments of the municipality for the fiscal year 1913–14. The petitioner was the lowest bidder for a considerable portion of these printed forms and blanks and was regularly awarded the contract to furnish the same at specified prices by the board of supervisors. At the time of the bidding and award of the contract the petitioner was conducting a union printing office, and was entitled to use and affix to its work the label of the Allied Printing Trades Council of the city and county of San Francisco. On the day following the award, however, the petitioner's right to the use of the label was taken away by the said trades council— which seems to have had the authority so to do; and the petitioner's establishment thereupon ceased to be a union office. Thereafter the mayor approved the resolution of the board of supervisors making said award to the petitioner, being at that time unaware that the petitioner's right to use the union

label had been revoked; but when a few days later a contract covering the items of petitioner's bid and award was presented to the mayor for his signature, he refused to sign and execute the same for two reasons: 1. That at the time of the presentation of the contract for his signature the petitioner was not entitled to the use of the label hereinbefore referred to, as was claimed to be required by resolution No. 2458 (fourth series) of the board of supervisors; and 2. That the said contract so presented by the petitioner for his signature was not sufficient in form in this: that it did not contain the express provisions as to hours of labor and as to the minimum wages of laborers required by the terms of article II, chapter III, section 1, of the charter.   Thereupon the petitioner made its application for the issuance of a writ of mandate to compel the appellant herein as mayor, to affix his signature to and to execute said contract, which application having been granted, the appellant prosecutes this appeal.

The latter of these objections will be considered first.   It is based on a provision at the end of section 1 of chapter III of article II of the charter of the city and county of San Francisco, which reads as follows:

"Every contract for work to be performed for the city and county must provide that in the performance of the contract eight hours shall be the maximum hours of labor on any calendar day, and that the minimum wages of laborers employed by the contractor in the execution of his contract shall be three dollars a day.   Any contract for work to be performed for the city and county which does not comply with the provisions of this section shall be null and void, and any officer who shall sign the same shall be guilty of misfeasance, and upon proof of such misfeasance shall be removed from office."

The proposed contract did not contain this provision.   The learned judge of the trial court held that this provision of the charter was not applicable to such a contract as this, and in this conclusion we are satisfied he was right.   In his opinion delivered in deciding the case he said:

"In my opinion this contract does not provide for the *doing of work for the city and county* within the meaning of this provision, but simply for the furnishing of certain finished articles of merchandise, which the contractor may have printed anywhere that he chooses. . . . These articles are the property of the contractor until delivered to the city, and do

not seem to come within this provision. No *work* is done for the city. It is rather like the case of furnishing structural steel for the erection of a building. The contractor simply furnishes a certain chattel for the city in a completed state, and it is not work done for the city. In this instance it is the making and delivering to the city of this material. It is merely a chattel or merchandise delivered to the city." The italics are ours.

It is probably unnecessary to add anything to this. The proposed agreement was simply one for the sale and delivery of printed forms and blanks. A contractor undertaking to sell and deliver to a city completed chattels or merchandise does not thereby undertake to perform "work" for the city. The distinction, in this respect, between a contract or agreement for sale to a city and a contract for the doing of work therefor is so clear as hardly to require statement. In the one case, if any work on his part is done in the way of manufacture or preparing the chattels or merchandise necessary to be sold and delivered, either personally or through employees, it is work done solely for himself, and in no proper sense, for the city. His contract with the city is simply for the sale and delivery of the finished article, and until the delivery the city has no interest whatever in the property. In the other case he contracts to furnish labor or personal service *directly to the city,* as where he agrees to construct a building for the city for a stipulated sum, or where he agrees to grade or otherwise improve a street belonging to the city, or to perform any other work for the city. Such contracts include the performance of work *for the city,* and the contractor must agree that "the minimum wages of laborers employed by "him in the execution of his contract shall be three dollars a day, and that eight hours shall be the maximum hours of labor on any calendar day. No distinction material to the question under consideration can be made between a contract or agreement for the sale of such articles as are already in existence, ready for delivery, and one for the sale of articles that must be manufactured or created to meet the demands of the contract. In neither case is there undertaken any "work to be performed for the city and county." The work done is not public work.

In this connection the case of *United States* v. *Ollinger,* 55 Fed. 959, a case decided in the United States district court

for the southern district of Alabama, the defendant being charged with violating the act of Congress making it unlawful for any contractor to employ upon any public work of the United States or the District of Columbia laborers or mechanics for more than eight hours of any calendar day, is directly in point, as the following quotation will show:

"In my opinion, a statement of the facts is alone sufficient to show that the act of Congress under which this prosecution is sought to be maintained has no application to the case. . . . If a contractor, he was a contractor to furnish to the government of the United States two barges, to be delivered within 40 days from the making of the contract, which, if built according to certain specifications furnished him, were to be purchased by the government from him. The barges were his, and were to be his until the government purchased them. They might or might not become the property of the government. The transfer of title to them depended upon conditions which could not be determined until the barges were completed. It is clear to me that the building of the barges was in no sense a part of the public works; no more so than the mining of coal contracted to be furnished to the navy and marine service of the United States according to specifications as to quantity and quality, or the furnishing under contract with the government of the United States of lumber and brick to be used in building quarters at Mt. Vernon barracks for officers or soldiers or any other public use, according to specifications as to kind, quantity, and quality. It would hardly be contended that the mining of such coal, the sawing of the lumber, or making the bricks, would be public works in contemplation of the act of Congress, or that the laborers engaged in the work of mining and in making the lumber and bricks were the laborers whose services and employment Congress has undertaken to regulate and limit. I fail to see any difference in principle in the cases mentioned and that under consideration."

A reading of the whole of the section of the charter in which the provision under consideration is contained makes it manifest that the provision is applicable only to contracts for work to be performed directly for the city and county, and that it was not intended to apply to any contract or agreement for the sale or furnishing of completed chattels.

The other objection is based upon resolution No. 2458 (fourth series) of the board of supervisors, passed in the year 1899, before the going into effect of the present charter. It is as follows:

"Resolved, By the board of supervisors of the city and county of San Francisco, that as the city and county is required to pay full price for all printing, the heads of departments be instructed to patronize only printing establishments that pay full wages, and, as a guarantee thereof, all city and county printing hereafter shall bear the label or be done in offices entitled to the use of the label of the Allied Printing Trades' Council of the city and county of San Francisco, as registered with the secretary of the State of California.

"Resolved, That the printing committee be instructed to award all jobs for printing to union offices.

"Resolved, That all jobs or printing for this department and all jobs coming within the province of the printing committee shall be referred to at least two members of said committee before being awarded."

As to this resolution the learned judge of the trial court held that so far as any action of the mayor here invoked is concerned, he is not the head of a department patronizing any printing establishment, but an officer who has simply approved an award made by the board of supervisors, and who is asked here to simply perform a ministerial duty not involving the exercise of any discretion whatever; that the resolution does not in terms apply to any action by the board of supervisors and is not binding on the board of supervisors, but was manifestly addressed only to heads of departments and to the printing committee; that the board of supervisors themselves without actually formally repealing this resolution, can award any contract within their jurisdiction regardless thereof. Without discussing the question whether the resolution was superseded by the charter, because inconsistent with the provision thereof in reference to letting such contracts to the lowest bidder, he concluded that the objection was not good, because the resolution is not applicable, the board of supervisors having itself awarded the contract.

We are of the opinion that the learned judge was right in his construction of the resolution. Manifestly, if we are to construe it according to its terms, it was simply a direction to heads of departments and the printing committee, and in no

way binding on the board itself in awarding contracts. The single provision therein on which appellant relies, viz.: "and as a guarantee thereof, all city and county printing shall hereafter bear the label," etc., is simply incidental to the specific instruction to heads of departments immediately preceding and, as it says, "a guarantee" of the observance of such instruction. It certainly cannot have the effect of invalidating an award of contract made by the board.

But regardless of this, and construing the resolution as purporting to apply to the board of supervisors, it is clearly inconsistent with provisions of the charter of San Francisco, and must be held to be without force. It is needless to say that the provisions of the charter are paramount. Only ordinances, orders, and resolutions that were not inconsistent with the present charter were continued in force at the time of its adoption, so that if the resolution was valid under the old Consolidation Act, which is not at all clear, it died with the adoption of the new charter, if inconsistent therewith. The matter of stationery and supplies in the way of printed blanks is regulated by the provisions of sections 1 and 3 of chapter III of article II of the charter. A method of competitive bidding for contracts to furnish such supplies is provided, and the board of supervisors has no power to purchase or pay for the same unless the provisions in regard thereto are strictly followed. Advertisement for bids for at least ten days, requiring the bidder to state the prices at which each article will be furnished as the same may be required, must be made, and as to printed blanks, "the contract or contracts must be made with the lowest bidder offering adequate security, quantity and quality being considered." The only condition imposed by the charter is that no article furnished shall have been made in any prison. Subject only to the right of the supervisors, provided for by section 5 of the same charter, when they "believe that the prices bid are too high, or that bidders have combined to prevent competition, or that the public interest will be subserved thereby" to "reject any and all bids," they *must* award the contract to the lowest bidder offering adequate security, "quantity and quality being considered." They cannot impose additional conditions, and any ordinance or resolution purporting to do so is ineffectual. The inconsistency of the resolution relied on with these provisions of the charter is obvious. A feeble attempt is made in

the briefs to show that the words "quantity and quality being considered" in the charter provision justify such a resolution, but we are utterly at a loss to see how they affect the question. They mean simply that *in determining what is the lowest bid made,* the board may take into consideration the "quantity and quality" of the supplies proposed to be furnished by the respective bidders.

The only authority cited by appellant in support of this resolution is the case of *Stanley-Taylor Co.* v. *Supervisors,* 135 Cal. 486, [67 Pac. 785], and it is most earnestly contended that this decision upholds the very resolution here involved, as a valid resolution. An examination of the opinion and of the record and briefs in that case shows that there is no basis for this claim. Even if we concede as argued by learned counsel for appellant, that, in view of the pleadings in that proceeding, the matter could not *logically* be decided against the plaintiff therein without upholding the resolution, it nevertheless remains that neither the trial court, nor this court, which adopted the opinion of the trial court, said a word about such resolution, or decided the case upon the theory that it was valid. Even the learned city attorney, in seeking to uphold the decision of the trial court in that case, did not suggest the existence of any such resolution in his brief, but placed his claims for affirmance on entirely different grounds. The plaintiff there, claiming to have been the lowest bidder, sought a writ of mandate to compel the awarding to it by the board of supervisors of the contract. A demurrer to the petition was sustained. It appeared that the board had rejected all bids "for the reason that public policy demands such action be taken." It is true that it was further alleged in the petition that no ground of public interest or public policy existed that would warrant such a conclusion and that the real reason for the rejection was that plaintiff had not been authorized to use the label of the Allied Printing Trades Council. It was held both by the trial court and by this court that in view of the provision of the charter that when the supervisors "believe that . . . the public interest will be subserved thereby, they may reject any and all bids and cause the notice for proposals to be readvertised," the supervisors were vested with absolute discretion to determine that matter; that it was intended that their discretion should be final and that they were the final arbiters in the matter and

their judgment conclusive; and that where such is the case, a writ of mandate will not lie to direct or mold or otherwise interfere with such discretion.   It was further said: "In this instance, as appears from the resolution adopted and set out in the petition, the board of supervisors exercised its discretion.   It determined a fact it was empowered by the charter to determine.   That its determination was erroneous or its reasons bad is immaterial.   It had jurisdiction to decide the matter, and having such jurisdiction, its judgment cannot be controlled by the courts.   How the public interest was subserved by rejecting the bid of plaintiff does not appear. Plaintiff was the lowest bidder, and had complied fully with the requirements of the charter, but that the board believed public policy would be subserved appears from the petition, and, under the law, action upon such belief is an exercise of discretion.   The legislature has committed the power of deciding to the defendant.   'When the supervisors *believe*,' is the language of the charter, 'that public interest will be subserved,' they may reject 'any and all bids.'   Were the court to interfere, it might substitute its belief and its judgment for the belief and judgment of the board, a result that our system does not contemplate.   The writ of mandate will lie to correct illegal but not capricious acts."   It is to be borne in mind that in the case at bar the board of supervisors did not reject the bid of plaintiff, but awarded the contract to it, and that the resolution of award was approved by the mayor.  We think it is manifest from all this that there is nothing in either the opinion or record in that case to warrant the claim made for it by learned counsel for appellant, and we have given it this somewhat extended notice only because of the apparent earnestness of counsel in making such claim.

Our conclusion is that neither of the objections to the proposed contract made by the defendant is good.

The judgment is affirmed.

Shaw, J., Sloss, J., Lorigan, J., Lawlor, J., Melvin, J., and Henshaw, J., concurred.